UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Shirley Vaughn, et al.,                                  Case No. 3:13 cv 409

        Plaintiffs

     v.                                                   MEMORANDUM OPINION
                                                             AND ORDER

Titan International Inc., et al.,

        Defendants

      This matter is before me on Defendants' motion for summary judgment as to the claims asserted by Plaintiff, Shirley Vaughn. Also before me is Plaintiff's opposition and Defendants' response. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

      Titan Tire Corporation of Bryan, Ohio is engaged in the manufacture of wheels and tires for off-road equipment. Shirley Vaughn, also known as Sam, was employed by Titan Tire as Manager in the Human Resources Department at the Bryan facility during the following events. Kyle Metz was also employed by Titan Tire as an hourly employee. Both Vaughn and Metz began their employment with Titan Tire in February 2012 .

      As the Human Resources Manager, Vaughn's team included Deb Smith, an HR generalist and Carrie Carr, an HR assistant. (Vaughn Dep., p. 58-59). Vaughn reported directly to the plant manager, Keith Reilly. In her role, Vaughn was responsible for making sure the Bryan salaried employees had the proper paperwork and handled issues relating to discipline and training with her

team handling benefits. (*Id.*) As to the hourly, union employees, Vaughn's role was to assist in labor relations, grievances, and situations between the hourly and salaried employees. (*Id.* at pp. 46-48). Vaughn previously served in the military including two years of active service and six years in the reserves, prior to her employment with Defendants. (*Id.* at p. 278). Vaughn also participated in regular production meetings along with the plant manager and other plant staff. (Briggs Dep., p. 17).

In September 2012, Metz was promoted to the third shift supervisory position for the South Side Tire Room, a salaried position. At all times during his employment, Metz was a reservist with the United States Marine Corps.

Occurring in this same time frame, according to Titan's president, Steven Briggs, a first round of layoffs was implemented at all three of Titan's plants. (Briggs Dep., pp. 10, 14). A second round of layoffs also occurred in the winter of 2012, including the Bryan facility. (*Id.* at pp. 13-14).

In late September 2012, Titan prepared to host labor arbitrations at the Bryan plant. Assistant General Counsel, Michael G. Troyanovich arrived a day early along with outside counsel, Gene LeSuer, and Titan's CEO, Maurice Taylor. (Troyanovich Dep., p. 16). Vaughn was asked to confirm reservations for the arbitrator and it was discovered the arbitrator was unaware of the scheduled arbitration. (*Id.* at p. 17). Troyanovich testified that Mr. Taylor was upset with Vaughn at this last minute snafu and the arbitration had to be cancelled. (*Id.*) According to Trayonovich:

> Mr. Taylor in the vernacular read her the riot act and said if you have any questions about anything HR resulted from this day forward you contact Troyanovitch, you got it? He was very descriptive because for a couple of reasons; number one, he doesn't like to see things get screwed up; number two, we sent a plane for Gene LaSuer from Quincy to Des Moines and from Des Moines to here, figure out the fuel bill for the day. It wasn't cheap. And the whole thing had to be scrapped because somebody didn't do their job and I thought, and I think so did everybody else in the room, it was Sam. So she got a directive from Mr. Taylor, the Chairman of the

2

> Board, that from that day forward she was to contact me if anything, if she had any questions whatsoever with HR.

(*Id.*)

In November 2012, Metz experienced problems in rearranging his schedule to accommodate a military drill under his new direct supervisor, Scott Bernath. On November 2, 2012, Vaughn was copied on email correspondence between Metz and Bernath regarding the November drill schedule. While at his reservist drill, Metz contacted his military representative, Darryle Johnson, for advice. Metz informed Vaughn of Johnson's advice on his rights under the Uniformed Service Employment and Reemployment Rights Act ("USERRA").

Around this same time, Vaughn had contact with Johnson and advised there was "an issue" with Metz and the scheduling of his return to work following his reserve duties. Johnson characterized Metz's treatment by Bernath and Shane Mack as "harassment." Mack was a fellow supervisor in the South Side Tire Room and worked the first shift. When Metz was unable to report to his appointed shift because of reserve duty, Bernath had him switch shifts with Mack. According to Vaughn, she met with Bernath about this issue after seeing the emails. Bernath expressed his displeasure and told Vaughn to "get rid of him," referring to Metz. (Vaughn Dep., at p. 148).

Vaughn also contacted Ty Steinman, a paralegal in corporate, to report the military leave issue and forwarded the Bernath/Metz email. Vaughn requested direction on the military leave issue. She was provided with materials and advised to train the supervisors on USERRA. She was also contacted by Cheryl Luthin, the HR person in corporate, and was advised to tell Bernath to "cease and desist" on this issue. (*Id.* at pp. 154-55). Vaughn conveyed Luthin's message to Bernath. (*Id.* at 155-56).

Vaughn was ultimately sent USERRA material for training purposes. On December 10, 2012, Vaughn conducted training on the USERRA for the managers prior to the normal morning meeting. (*Id.* at p. 141).

At that meeting the managers and Vaughn discussed the upcoming layoff. Approximately 46 of the 50 layoffs involved hourly employees based upon seniority under the collective bargaining agreement. The remaining 4 employees were chosen by management. Metz was one of four salaried employees chosen for a layoff and his last day of employment was December 14, 2012. There is no dispute that Bernath was involved in the decision to select Metz for the layoff (Bernath Dep., p. 38).

Shortly thereafter, Troyanovich spoke with Briggs about Vaughn and a failed reimbursement for medical insurance benefits related to an employee out on an extended leave of absence. (Troyanovich Dep., p. 29). Troyanovich recommended, and Briggs agreed with the recommendation, to terminate Vaughn's employment. (*Id.* at p. 31).

On December 20, 2012, Vaughn met with Reilly and Thomas Ort and was advised of her termination. (Vaughn Dep., p. 251-52).

On May 5, 2013, Metz and Vaughn filed this lawsuit each alleging a violation of USERRA, 38 U.S.C. § 4311(a) and (b). (Counts One and Three). Metz also claims discrimination based upon his military status under 41 O.R.C. § 4112.02(A) (Count Two).

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

4

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.

5

Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Vaughn alleges a violation of USERRA having "been denied her rights to retention in employment and/or to be free from retaliation for taking action to protect his right to retention in employment." (Doc. No. 7, ¶ 53). The Defendants request summary judgment because they contend Vaughn did not engage in a protected act under USERRA and her termination was for a reason unrelated to Metz.

### CLAIM UNDER USERRA

**APPLICABLE LAW**

In 1994, the Uniformed Services Employment and Reemployment Rights Act ("USERRA") was enacted[1]: "(1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against such persons because of their service in the uniformed services." 38 U.S.C. § 4301(a).

---

[1] USERRA was enacted to replace the Veterans' Reemployment Rights Act, formerly codified at 38 U.S.C.A. § 2021-2027, then 38 U.S.C.A. § 4301-4307.

6

The statutory framework under USERRA contemplates causes of action for discrimination and retaliation under 38 U.S.C. § 4311[2]. The employer is considered to have engaged in prohibited actions where "the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can provide that the action would have been taken in the absence of membership, application for membership, service, application for service." *Id.* at § 4311(c)(1).

The plaintiff is required to demonstrate that her conduct under the statute, "was a motivating factor in an adverse employment action." *Hance v. Norfolk Southern Rwy. Co.*, 571 F.3d 511, 518 (6th Cir. 2009). Therefore, to establish a prima facie case of discrimination under USERRA, the plaintiff must present evidence that the employer "relied on, took into account, considered or conditioned its decision" on conduct or action protected by the statute. *Hodges v. City of Milford*, 918 F.Supp. 2d 721, 751 (S.D. Ohio 2013), citing *Petty v. Metro Gov'l of Nashville-Davidson Cnty.*, 538 F.3d 431, 446 (6th Cir. 2008) (quotation omitted).

"Once the plaintiff has discharged this initial burden of establishing a prima facie case of discrimination, 'the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason.'" *Id.* citing *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (internal citations omitted). The Sixth Circuit recognizes USERRA to be broadly construed in favor of its military beneficiaries. *Petty v. Metropolitan Government of Nashville-Davidson Co.*, 538 F.3d 431, 446 (6th Cir. 2008), *cert. denied*, 556 U.S. 1165 (2009). *See also Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196 1980) (noting the liberal construction of the statute which was the predecessor of USERRA).

---

[2] An employer is prohibited from discrimination where "such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter." *Id.* at § 4311(b).

**DISCUSSION**

Initially the parties dispute whether Vaughn engaged in conduct protected by USERRA. *See Grosjean v. FirstEnergy*, 481 F.Supp. 2d 878, 884-85 (N.D. Ohio 2007) (noting that a plaintiff must first show engaging in conduct protected by USERRA).

Defendants argue Vaughn advocated for a right not afforded under USERRA[3] as Metz was given sufficient time under the statute[4] before being required to report back to his job. It is also Defendants' position that Vaughn did not oppose Metz's selection for a layoff because of his status as a member of the military. Instead, they assert she was reluctant to process his layoff because of a lack of documentation in his personnel file.

Vaughn contends she possessed a reasonable, good faith belief she was opposing unlawful conduct via her complaints and advocating on behalf of Metz. Vaughn relies on cases dealing with protests against discriminatory practices in general and the acceptance of a reasonable, good-faith belief in those actions as meeting this requirement. *E.g., Montell v. Diversified Clinical Services, Inc.*, 757 F.3d 497, 504-05 (6th Cir. 2014) (Factual circumstances may support a good-faith, reasonable belief that a plaintiff was reporting harassment). *See also, Quick v. Froniter Airlines, Inc.,* 544 F.Supp. 2d 1197, 1208-09 (D. Colo. 2008) (although the parties agreed the plaintiff's assertion of rights placed

---

[3] Under 38 U.S.C. § 4312 (e)(1)(A):

In the case of a person whose period of service in the uniformed services was less than 31 days, by reporting to the employer—

(i) Not later than the beginning of the first fully regularly scheduled work period on the first full calendar day following the completion of the period of service and the expiration of eight hours after a period allowing for the safe transportation of the person from the place of that service to the person's residence; or
(ii) As soon as possible after the expiration of the eight-hour period referred to in clause (i), if reporting within the period referred to in such clause is impossible or unreasonable through no fault of the person.

[4] *See Gordon v. Wawa, Inc.*, 388 F.3d 78, 84-82 (3d Cir. 2004) ("By its plain terms § 4312 ( e) sets forth the requirements of an employee to notify the employer of the employee's intention to return to work. The eight-hour period referred to in § 4312 (e) (A) (i) marks the outer limit of time by which the employee must report to the employer upon returning home from military service.")

him in the class of protected persons under USERRA, the district court cited a Tenth Circuit case for the general proposition that a reasonable good-faith belief that the opposed behavior was discriminatory was sufficient for a retaliation claim under Title VII) (citation omitted).

For purposes of this discussion, I will assume Vaughn has demonstrated she engaged in protected activity. The critical inquiry in the analysis is whether engaging in that protected activity was a motivating factor in her termination. I find it was not.

In considering a claim under USERRA, "[d]iscriminatory motivation may be inferred from a variety of considerations, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the employer's conduct and the proffered reason for its actions, the employer's expressed hostility toward military members together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 754 (6th Cir. 2012) (citation omitted).

Briggs testified that Vaughn reported directly to the plant manager, Keith Reilly and it would have been Reilly's responsibility to review her job performance. (Briggs Dep., p. 18). Briggs confirmed he was involved in the decision to terminate Vaughn after discussing the matter with assistant general counsel Troyanovich:

Q: What was the reason Ms. Vaughn was let go?

A: The morning she was let go, I received a call from Mr. Troyanovich, who is our corporate counsel and also leads our human resources group. And he informed me that there was a gentleman who was on a leave of absence, and the benefits should have been cancelled and they weren't. He also went on to tell me that there were other incidents that Ms. Vaughn had been involved with, and his strong recommendation was that we move ahead and terminate her, and I agreed with his assumption.

Q: Did he ask for any documentation?

A: No.

> Q: Did you do any investigation on your own into it?
>
> A: No.
>
> Q: So it was just one phone call on the morning that she was terminated?
>
> A: That is correct, yes.
>
> Q: Did Mr. Troyanovich indicate to you that he had documentation or had he done any investigation on his own?
>
> A: Yes, he did.
>
> Q: What did he tell you he had done?
>
> A: Well, some of the examples was [sic] that there were three cases of her allowing FMLA before the time limit was required. There was a HIPA violation. She had asked employees to submit their active prescriptions to her so that she could see if there was any job impact. And those were a couple of them.

(*Id.* at pp. 18-19).

Troyanovich's deposition testimony corroborates Briggs' recollection on the decision to terminate Vaughn:

> Q: Ok. And tell me what you recall occurring.
>
> A: I believe Steve [Briggs] called me and said that someone who had been out on a leave of absence had been receiving medical insurance benefits for a number of months and had not been reimbursing the company and this has been going on. And so, I said, ok. What do you think? And we spoke a little bit and either we hung up and reconvened about a half hour later to let each of us think about it of, [sic] and I think that's what happened, we had two telephone calls. My vote was to terminate her, to terminate Sam; A, because of the September slash October incident, whatever that was; and B, this on top of it. You know, we're a publicly held company and have shareholders to watch out for and wasting of resources doesn't go over real well.

(Troyanovich Dep., pp. 29-30).

Deb Smith, the HR Generalist, testified that an employee named Meade took a non-FMLA leave of absence beginning March 12, 2012. (Smith Dep., p. 10). While on leave, Meade agreed to continue to pay for his share of health care premiums. (*Id.* at p. 11). Part of Smith's responsibilities included making sure employees like Meade paid their health insurance premiums and she testified having a process in place to ensure compliance with the reimbursement of

premiums by the employee.  (*Id.*)  Smith changed her tickler system at the beginning of 2013 after her previous system failed to alert her to Meade's failure on reimbursements of these premiums.  (*Id.* at pp. 13-16).

Vaughn was Smith's direct supervisor.  (*Id.* at p. 17).  Smith recalls discussing Meade's circumstance with Vaughn approximately a month after he took leave:

> Q:  Did you ever go to [Vaughn] regarding the Mike Meade issue?
>
> A:  Originally, yes.
>
> Q:  And when was that?
>
> A:  It would have been in the spring, it would have been probably a month after he went out on leave.
>
> Q:  All right.  Tell me about that.
>
> A:  I just went to her and said he needs to pay his benefits.  I didn't have a phone number, could she get me a phone number?  She said she would contact him.
>
> Q:  Did you ever send an email about this?
>
> A:  No.
>
> Q:  But ultimately it would be your responsibility to terminate the benefits?
>
> A:  Yes.
>
> Q:  Did you follow up with Ms. Vaughn?
>
> A:  No.
>
> Q:  Why not?
>
> A:  Forgot.
>
> Q:  You forgot?
>
> A:  I forgot, yes.

(*Id.* at pp. 18-19).

Smith became aware of this error after the corporate office contacted Vaughn to advise that Meade failed to reimburse the company as to his portion of the benefits and those benefits had not been cancelled.  (*Id.* at p. 14).  She remembers this occurring the week that Vaughn was terminated.

11

(*Id.* pp. 14-15). The day Vaughn was terminated, she told Smith her termination was "because of the Michael Meade issue." (*Id.* at p. 29).

Reilly was directed by the company president, Briggs, to terminate Vaughn. (Reilly Dep., p. 34). Reilly and Tom Ort met with Vaughn and advised her of her termination "for her mishandling in the Mike Meade benefits case." (*Id.*).

Vaughn testified that at the time of her termination she inquired of Reilly and Ort as to the reason for her termination and was told "it was a corporate decision; they did not know." (Vaughn Dep., pp. 251-52 ).

Vaughn averred that the corporate office was responsible for the scheduling of the arbitration as it was "a corporate function handled by Luthin on behalf of Cheri Holley." (Vaughn Aff. at ¶ 4). Cheryl Luthin was the HR corporate manager and Cheri Holley was legal counsel for Titan Tire. (Vaughn Dep., p. 258). Therefore, any mistakes as to scheduling details of the arbitration were not attributable to Vaughn.

The problem with Vaughn's argument is that even if the decision makers, Briggs and Troyanovich, were mistaken in her responsibility for the arbitration scheduling mistake, it was unrelated to Plaintiff's engaging in protected activity as a motivating factor in her discharge.

Vaughn also takes issue in being held responsible for the Meade situation. She argues that "Smith admitted the mistake was entirely her fault and even tendered her resignation." (Vaughn Opp., p. 18). Vaughn argues she had "no role" in this situation and was terminated without prior disciplinary action. (*Id.*) She argues that unlawful motivation can be inferred when the employer's decision is so unreasonable so as to cast doubt on the actual motivation. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003).

12

However, Vaughn was Smith's supervisor and was ultimately responsible for her HR team. Smith reported directly to Vaughn and no one else. Vaughn was advised by Smith a month after Meade was on leave, that he needed to reimburse the company for his benefits. Vaughn did not follow through in contacting Meade and this situation went uncorrected for nine months. As the HR Manager, Vaughn was ultimately responsible for her team's responsibilities.

Adding to this situation, during the last quarter of 2014, a total of three hundred employees were laid off, with the Bryan plant sustaining a third of these cuts. (Briggs Dep., p. 14). Given the employee reductions implemented, the length of time the Meade reimbursement issue went unabated under Vaughn's supervision, Troyanovich's concerns about responsibilities to the company's shareholders and the wasting of assets were not without foundation.

Briggs also testified that he found Vaughn's behavior at a production meeting on one particular occasion to be "erratic" and this weighed in his decision to agree to Vaughn's termination. (*Id.*, p. 19).

Moreover, neither Briggs nor Troyanovich were aware of Vaughn's advocating on behalf of Metz based upon his military status. They were aware that USERRA training was requested and were in favor of it. However, there is no evidence to support Vaughn's position that Briggs and Troyanovich's decision was based upon her advocacy of Metz's military status.

Based upon the record before me, I find that Vaughn has failed to establish that her advocacy of Metz's rights under USERRA constituted a motivating factor in her termination. Accordingly, she has failed to establish her prima facie case and the Defendants are entitled to summary judgment on Count III.

13

## CONCLUSION

Based upon the foregoing, Defendants' motion for summary judgment as to Shirley Vaughn (Doc. No. 28) is granted. Count III is dismissed with prejudice and Shirley Vaughn is dismissed from this case. In addition, Defendants' motion to bifurcate (Doc. No. 30) and Plaintiff Vaughn's motion to strike the affidavit of Keith Reilly (Doc. No. 45) are denied as moot.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge
