UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Shirley Vaughn, et al.,                                  Case No. 3:13 cv 409

        Plaintiffs

      v.                                         MEMORANDUM OPINION
                                               AND ORDER

Titan International Inc., et al.,

        Defendants


This matter is before me on Defendants' motion for summary judgment as to the claims asserted by Plaintiff, Kyle Metz. Also before me is Plaintiff's opposition and Defendants' response. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons that follow, Defendants' motion is denied.

## BACKGROUND

The following facts are undisputed. Titan Tire Corporation of Bryan, Ohio is engaged in the manufacture of wheels and tires for off-road equipment. Kyle Metz was employed by Titan Tire as an hourly employee and was initially assigned to the second shift. Shirley Vaughn was also employed by Titan Tire as Manager in the Human Resources Department during the following events. Both Vaughn and Metz began their employment with Titan Tire in February 2012 .

At all times during his employment, Metz was a reservist with the United States Marine Corps. In September 2012, Metz was promoted to the third shift supervisory position for the South Side Tire Room, a salaried position. Following his promotion, Metz initially reported to John

Martinez. When Martinez was moved to the North Side Tire Room, Metz's direct supervisor became Scott Bernath.

In November 2012, Metz experienced problems in rearranging his schedule to accommodate a military drill. On November 2, 2012, Vaughn was copied on email correspondence between Metz and Bernath regarding the November drill schedule. While at his reservist drill, Metz contacted his military representative, Darryle Johnson, for advice. Metz informed Vaughn of Johnson's advice on his rights under the Uniformed Service Employment and Reemployment Rights Act ("USERRA").

Around this same time, Vaughn had contact with Johnson and advised there was "an issue" with Metz and the scheduling of his return to work following his reserve duties. Johnson characterized Metz's treatment by Bernath and Shane Mack as "harassment." Mack was a fellow supervisor in the South Side Tire Room and worked the first shift. According to Vaughn, she met with Bernath about this issue after seeing the emails. Bernath expressed his displeasure and told Vaughn to "get rid of him," referring to Metz. (Doc. No. 32 at p. 148).

Vaughn also contacted Ty Steinman, a paralegal in corporate, to report the military leave issue and forwarded the Bernath/Metz email. Vaughn requested direction on the military leave issue. She was provided with materials and advised to train the supervisors on USERRA. She was also contacted by Cheryl Luthin, the HR person in corporate, and was advised to tell Bernath to "cease and desist" on this issue. (*Id.* at pp. 154-55). Vaughn conveyed Luthin's message to Bernath. (*Id.* at 155-56).

Vaughn was ultimately sent USERRA material for training purposes. On December 10, 2012, Vaughn conducted training on the USERRA for the managers prior to the normal morning meeting. (*Id.* at p. 141; Doc. No. 36 at p. 19).

2

At that meeting the managers and Vaughn discussed the upcoming layoff. Approximately 46 of the 50 layoffs involved hourly employees based upon seniority under the collective bargaining agreement. The remaining 4 employees were chosen by management. Metz was one of four salaried employees chosen for a layoff and his last day of employment was December 14, 2012. There is no dispute that Bernath was involved in the decision to select Metz for the layoff (Doc. No. 37, p. 38).

Later that month, Vaughn was also terminated from employment.

On May 5, 2013, Metz and Vaughn filed this lawsuit with each alleging a violation of USERRA, 38 U.S.C. § 4311. Additionally, Metz alleges discrimination based upon his military status under 41 O.R.C. § 4112.02(A) (Count Two).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment

3

cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As stated above, Metz alleges a violation of USERRA having "been denied his rights to retention in employment and/or to be free from retaliation for taking action to protect his right to retention in employment." (Doc. No. 7, ¶ 49). He also alleges a state law claim of unlawful

discrimination based upon his military status under O.R.C. § 4112.02(A). The Defendants request summary judgment because his selection for a layoff was due to performance issues without regard to his military service.

## CLAIM UNDER USERRA

**APPLICABLE LAW**

In 1994, the Uniformed Services Employment and Reemployment Rights Act ("USERRA") was enacted[1]: "(1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; (2) to minimize the disruption to the lives of persons performing service in the uniformed services as well as to their employers, their fellow employees, and their communities, by providing for the prompt reemployment of such persons upon their completion of such service; and (3) to prohibit discrimination against such persons because of their service in the uniformed services." 38 U.S.C. § 4301(a).

The statutory framework under USERRA contemplates causes of action for discrimination and retaliation under 38 U.S.C. § 4311[2]. The employer is considered to have engaged in prohibited actions where "the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can provide that the action would have been taken in the absence of membership, application for membership, service, application for service." *Id.* at § 4311(c)(1).

---

[1] USERRA was enacted to replace the Veterans' Reemployment Rights Act, formerly codified at 38 U.S.C.A. § 2021-2027, then 38 U.S.C.A. § 4301-4307.
[2] An employer is prohibited from discrimination where "such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter." *Id.* at § 4311(b).

The plaintiff is required to demonstrate that their "military service was motivating factor in an adverse employment action." *Hance v. Norfolk Southern Rwy. Co.*, 571 F.3d 511, 518 (6th Cir. 2009). "Once the plaintiff has discharged this initial burden of establishing a prima facie case of discrimination, 'the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason.'" *Id. citing Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001) (internal citations omitted). The Sixth Circuit recognizes USERRA to be broadly construed in favor of its military beneficiaries. *Petty v. Metropolitan Government of Nashville-Davidson Co.*, 538 F.3d 431, 446 (6th Cir. 2008), *cert. denied*, 556 U.S. 1165 (2009). *See also Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196 (1980) (noting the liberal construction of the statute which was the predecessor of USERRA).

In considering a claim under USERREA, "[d]iscriminatory motivation may be inferred from a variety of considerations, including proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the employer's conduct and the proffered reason for its actions, the employer's expressed hostility toward military members together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses." *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 754 (6th Cir. 2012) (citation omitted).

Where a claim of discrimination arises out of a reduction in force and as part of the prima facie case, a plaintiff is required "to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Rachells v. Cingular Wireless Employee Services, LLC*, 732 F.3d 652, 661 (6th Cir. 2013), *citing Geiger v. Tower*, 579 F.3d 614, 622 (6th Cir. 2009).

**DISCUSSION**

In this case, Defendants acknowledge Metz's status as a reservist and his entitlement to rights under USERRA. They contend he cannot succeed on summary judgment because his termination from employment was due to a reduction in force, which constitutes termination for cause. They further maintain his military status was not a motivating factor in that decision. They also dispute Metz's actual work schedule was in violation of the requirements under USERRA.

In this instance, Metz asserts his reservist duties were a motivating factor in his discharge. He cites the testimony of Vaughn who testified Bernath was unhappy with having to accommodate Metz's schedule and indicated his desire to see Metz terminated in early November 2012. The conversation Vaughn had with Metz was prompted by emails between Metz and Bernath regarding Metz's reservist duty. Vaughn was copied on these emails. The meeting with Vaughn and Bernath was, according to Vaughn, in response to an inquiry from Darryle Johnson. Specifically, Vaughn related her conversation with prior to the usual morning meeting:

> A: We went to Scott Bernath's office and Scott Bernath is not really happy right now, so I ask him what the issue is. You know, they summon you into the office so you've got to find out what the issue is.
>
> At which point, he is not happy that there are drills going on for Kyle Metz, and he—he asked me—he's like, you need to get rid of him, he's making a problem. And I said, do you—do you have documentation for him, is there—you know, why do I need to get rid of him? And he's not a team player. That is what Bernath was telling me. He's not a team player, he's part of the military, he goes to these drills, and there was explicit words in there.
>
> Q: Some profane words?
> A: Yes.
> Q: Okay. F words?
> A: Yes.
> Q: Okay.
> A: And tells me—he said he's not going to deal with it, Metz needs to man up like everybody else. And I said, he's got drill and stuff. And he goes, it's not my issue, F-ing get rid of him.

7

> Q: And this is on November 9?
>
> A: Yeah.
>
> Q: More than a month before the USERRA training?
>
> A: It's right—it's before the USERRA training, before it gets heated into a situation worse than it is.

(Vaughn Dep., Doc. No. 32 at pp. 147-49).

Bernath's attitude towards Metz was also noticed by another manager, Dennis Skeens:

> 11. During a morning manager meeting in the late fall of 2012, Scott Bernath expressed frustration and irritation about the scheduling burden created by an employee who was a member of the military and who attended drill on weekends.
>
> 12. Bernath stated that his department was having scheduling issues because one of his supervisors was claiming he was required to attend military drill that weekend.
>
> 13. Bernath then stated that he was going to make the supervisor come to work Sunday night when he returned from drill.
>
> 14. Bernath claimed that the supervisor would technically be working Monday, since most of his work shift would be in the early morning hours of Monday.
>
> 15. I spoke up and said he could not do that, because although Titan considers this to be Monday, it is still Sunday and the supervisor would need sleep before returning to work.
>
> 16. I explained that it was my understanding that members of the military are entitled to a break between drill and work.
>
> 17. It appeared to me that Scott Bernath did not care about the supervisor's military rights, and was inflexible about changing the schedule.
>
> 18. During this same meeting, in response to Scott Bernath's opposition, Sam Vaughn interjected and said that the law protects employees who are members of the military and attend drill and that Bernath must follow the law even if he didn't agree with it.
>
> 19. Bernath acted very irritated by the supervisor's drill obligation and was adamant that Titan could make him work that same night, immediately after returning home from drill.
>
> 20. Ms. Vaughn and I were the only two people that stood up for Kyle Metz and told Bernath that Metz should not have to report directly to work following his military drill.

> 21. Throughout my employment with Titan, there was a perception by some managers that employees who were members of the military used drill as an excuse to avoid having to work. I never understood the basis for, and disagreed with this perception.

(Skeens Decl., pp. 1-2).

The problems between Metz and Bernath began on November 2, 2012, as demonstrated by the emails regarding scheduling and Vaughn was copied on these emails. Bernath's irritation with the situation is exemplified in the conversation he has with Vaughn approximately a week later. This is sufficient to constitute evidence that Metz's military service was a motivating factor in the adverse employment action. *See Grosjean v. FirstEnergy*, 481 F. Supp. 2d 878, 886 (N.D. Ohio 2007).

However, as this is a reduction in force case, Metz must provide evidence which supports the Defendants singled him out for discharge based upon impermissible reasons. *Rachells, supra*.

The emails critical of his job performance began on November 7, 2012, and the last one was sent on December 5, 2012. They are characterized by Defendants as "critical of his [Metz's] job performance as Tire Room Supervisor." (Def's Mot. At p. 9):

> Email of Nov. 7, 2012 from Shane Mack to Kyle Metz and Timothy Routzon, with a copy to Scott Bernath:
>
> We have a grievance for Bernie Harvey doing utility work and Larry King wants paid for the 4 hour block. Kyle, this happened on 3rd shift when you opened up a utility spot for the over time guys. From now on do not use over time tire builders to do utility work. Use a guy on straight time. We can back fill but we cannot use someone who is on over time.

(Doc. No. 29-2).

> Email of Nov. 13, 2012 from Shane Mack to Kyle Metz and Timothy Routzon, with a copy to Scott Bernath:
>
> Kyle, there is [sic] 3 skids of 5568 in the noncomforming area outside the tire room office. Once of them has your initials on it and the [sic] another one has Zack 5chaffners [sic] initials on it. The third one has nothing on it but a date. Have your light duty guys fix this and go

9

>over it with the small radial treaders that the skids have to linered, weighed, dated and signed off by you and the builder or servicer.

(Doc. No. 29-3).

>Email of Nov. 13, 2012 from Shane Mack to Kyle Metz, with a copy to Scott Bernath:
>
>Kyle on my sheet and in the book you put no wire for the 36067. We have had wire all day and I did not know this. If we are out of something make sure you look.

(Doc. No. 29-4).

>Email of Nov. 14, 2012 from Shane Mack to Kyle Metz and Timothy Routzon, with a copy to Scott Bernath:
>
>The non conforming area needs cleaned out at the end of every shift. There should not be anything left in there without a red tag on it. The only thing that should be left in this area is if it is waiting to be checked by tire engineering, and a email should be sent to all the supervisors so we know what is going on with it. This area is becoming a catch all and it needs to stop.

(Doc. No. 29-5).

>Email of Nov. 14, 2012 from Shane Mack to Kyle Metz, with a copy to Scott Bernath:
>
>Kyle, we need to try to do everything possible to keep all the machines running. Such as TBM#28 was sitting idle with no body bands for the 133 and all you had to do was reset to the 169 and start building. Also the cocked bead on the TBM#30 when I called Brian S. he did not know anything about it. You need to get all the tires on the QA hold taken care of as soon as possible. If you have to call Brian at home do so.

(Doc. No. 29-6).

The final email chain was in response to an inquiry on the weekly supervisor safety checklist.

>Email of December 5, 2012 at 10:01 a.m. from Scott Bernath to Shane Mack, John Martinez, Dan Melton, Kyle Metz, Bob Mohre, Phillip Norton, Timothy Routzon, Joe Wohlgamuth:

10

> Kyle, have you been instructed this needs to be done on a weekly basis?  Please response.
>
> North side has a lot of work to do.
>
> ScottB

(Doc. No. 29-7).

> Email Response from Kyle Metz to Scott Bernath, December 5, 2012 at 10:07 p.m.:
>
> No I have not 4 crew I thought did it.

(*Id.*).

> Email response from Scott Bernath to Kyle Metz, December 6, 2012 at 6:40 a.m.:
>
> North side is north side, please [sic] make sure you are doing a weekly tour from this point on.
>
> Thanks
>
> ScottB

(*Id.*).

These emails were not placed in Metz's personnel file nor was he subject to discipline as a result of these criticisms.

Metz participated in reservist duty again in December 2012.  While at the drill, on Sunday, December 9, 2012,  Metz emailed Bernath to advise him that he would not be released early from his drill and would not return home until 8:30 p.m.  As Metz was slated to begin his regular shift at 10:00 p.m. that same evening, he wanted direction from Bernath as to when he needed to report.

11

The next day, after getting materials from her superiors in corporate, Vaughn conducted training for the managers on USERRA. The managers present at that training included, among others, Bernath. At the training, Bernath asked if the training was related to Metz and his reservist drills. (Vaughn Dep., p. 297-98; Bernath Dep., pp. 21-22).

Contemporaneous with the training at the morning meeting, Keith Reilly, the operations manager continued discussions to determine which supervisors would be subject to the cuts. (*Id.* at pp. 170-173). Four names were discussed, one of which was Kyle Metz. Bernath testified that he was involved in the decision to select Metz for the layoff. (Bernath Dep., pp. 37-38). According to Bernath, he chose Metz because he was the "[n]ewest supervisor, lowest performer." (*Id.*) Reilly corroborated Bernath's discussion of Metz's performance, characterizing it as "he's [Metz] struggling, he's not making it." (Reilly Dep., p. 30).

Vaughn protested over two of the four persons named for the layoffs, one of whom was a veteran and the other, Metz, who was a reservist. She testified she was pressured by Reilly to process the documents to implement the layoff but her reluctance regarding Metz was because there was no documentation to support his termination. (Vaughn Dep., p. 189). After speaking with Defendants' general counsel, on December 14, 2012, Vaughn notified Metz of the layoff. The layoff was ultimately a permanent termination.

Also, according to Vaughn's testimony, the directive on the second layoff was the subject of discussions which began in early November. (Vaughn Dep., pp. 81-85). By the December meeting, at which Vaughn conducted training on USERRA, discussions continued as to which four supervisors would be laid off. Bernath again proposed Metz for layoff stating it was based upon his job performance. At this time, Metz had no record of disciplinary action in his personnel file.

The span of time between the initial email exchange regarding Metz's reservist duty impacting his reporting for work, under Bernath, to Metz's termination was forty-two days. There is

nothing to indicate Metz had problems initially as a supervisor under John Martinez.  Only after Metz began reporting to Bernath and served reservist duty did problems begin to surface.   Taken as a whole, the events during this period provide a circumstantial basis to support Metz was singled out for discharge based upon his military status.

The burden then shifts to the employer to show, by a preponderance of the evidence, that Defendants would have taken the adverse action for a valid reason.  As I must broadly construe USERRA in favor of the Plaintiff, I find that reasonable minds could differ on whether Metz was terminated for valid performance reasons or singled out by Bernath because of his military status. *See Mullins v. Goodman Distribution, Inc.*, 694 F. Supp. 2d 782, 789 (S.D. Ohio 2010).

Finally, as noted by the Defendant, because a determination on a violation under USERRA falls along the same lines as the analysis for determination of discrimination under the Ohio statute, R.C. § 4112.02(A),  the state law claim also remains viable.

## CONCLUSION

Based upon the foregoing, Defendants' motion for summary judgment as to Kyle Metz (Doc. No. 29) is denied.

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge